855 F.2d 48
 57 USLW 2139, 18 Envtl. L. Rep. 21,317,
13 O.S.H. Cas.(BNA) 1849,
1988 O.S.H.D. (CCH) P 28,291
 ENVIRONMENTAL ENCAPSULATING CORP., Central Jersey Coating,
Inc., Abatement International Ltd., Jack's
Insulation Contracting Corp., and John's
Insulation, Inc., Plaintiffs-Appellants,
v.
The CITY OF NEW YORK and City of New York Department of
Environmental Protection, Defendants-Appellees.
 No. 493, Docket 87-7762.
 United States Court of Appeals,
Second Circuit.
 Argued Feb. 8, 1988.
Decided Aug. 17, 1988.
 
 Sharon E. Jaffe, New York City (Joseph DiBenedetto, Paul A. Gallay, Cole & Deitz, New York City, of counsel), for plaintiffs-appellants.
 Kristin M. Helmers, New York City (Francis F. Caputo, Peter L. Zimroth, New York City, of counsel), for defendants-appellees.
 Michael B. Gerrard, New York City (Anne C. Weisberg, Berle, Kass & Case, New York City, of counsel), filed a brief on behalf of Brooklyn Lung Ass'n, The New York City Clean Air Campaign, Inc., The New York Committee for Occupational Safety and Health, The New York Public Interest Research Group, Inc., The Alliance for Consumer Rights, Inc., and The Natural Resources Defense Council, Inc. as amicus curiae.
 Robert Abrams, Atty. Gen., State of N.Y. (O. Peter Sherwood, Sol. Gen., Jane Lauer Barker, Asst. Atty. Gen. In Charge of Labor Bureau, Harvey M. Berman, Richard Corenthal, Asst. Attys. Gen., New York City, of counsel), filed a brief on behalf of the State of N.Y. as amicus curiae.
 Before CARDAMONE and PIERCE, Circuit Judges and STANTON, District Judge.*
 CARDAMONE, Circuit Judge:
 
 
 1
 This appeal from the grant of a motion for summary judgment addresses the interplay between a state's exercise of its police power and federal law regulating occupational health and safety matters. In this case the legislative efforts are directed toward asbestos, whose invisible airborne fibers carry a deadly potential for humans.
 
 
 2
 Asbestos, a family of inorganic fibrous mineral substances once thought to be "wonder materials" and commonly used in building construction, has been identified in recent years as a formidable public health threat. Exposure to airborne asbestos fibers--often one thousand times thinner than a human hair--may induce several deadly diseases: asbestosis, a nonmalignant scarring of the lungs that causes extreme shortness of breath and often death; lung cancer; gastrointestinal cancer; and mesothelioma, a cancer of the lung lining or abdomen lining that develops 30 years after the first exposure to asbestos and that, once developed, invariably and rapidly causes death. In 1972 New York City completely banned asbestos spraying in construction. But before the deadly hazards of asbestos were realized, more than half of the high-rise commercial buildings built in the City between 1958 and 1972 used asbestos as fireproofing material and, moreover, virtually every boiler room uses the material as a thermal insulator. New York City buildings contain an estimated 3.5 million tons of asbestos.
 
 
 3
 With the preservation of public health skating on such thin ice, both the federal government and the City of New York have recognized that safety lies in speedy action, which each has taken. The federal Occupational Safety and Health Administration (OSHA) has promulgated regulations protecting construction workers from asbestos exposure pursuant to the Occupational Safety and Health Act of 1970, Pub.L. No. 91-596, 84 Stat. 1590, reprinted in 1970 U.S.Code Cong. & Admin.News 1852 (codified as amended at 29 U.S.C. Secs. 651-678 (1982)) (the Act or OSH Act). The City of New York (City) and its Department of Environmental Protection (DEP) also have established a training and certification program for workers who handle asbestos (DEP program or regulations) to minimize the threat to the public from asbestos removal.
 
 
 4
 Appellants Environmental Encapsulating Corp., et al. (collectively Environmental Encapsulating) are asbestos abatement contractors. Their employees remove asbestos from public and private buildings in New York City. Appellants contend that the local government's campaign against public exposure to airborne asbestos is preempted by federal law. A thorough exposition of the local and federal regulatory programs is necessary to understand fully the basis of appellants' claim.
 
 THE REGULATORY SCHEME
 A. The New York City Program
 
 5
 On November 19, 1985 the New York City Council passed Local Law 76, which amended the City Air Pollution Control Code to provide that "[i]t shall be unlawful for any individual to handle friable asbestos material in the course of performing work for compensation on an asbestos project unless such individual is a holder of a current, valid asbestos handling certificate." New York, N.Y., Admin.Code Sec. 24-146.1(b)(1) (1986). "Friable asbestos material" is "any asbestos or any asbestos containing material that can be crumbled, pulverized or reduced to powder when dry, by hand pressure." Id. Sec. 24-146.1(a)(9). Similarly, it became unlawful to employ any individual to handle friable asbestos material unless that person possessed a valid handling certificate. Id. Sec. 24-146.1(b)(2). Local Law 76 further provided that the DEP commissioner should promulgate regulations "establishing procedures for the safeguarding of the health and safety of the public and all persons who work at or in the vicinity of an asbestos project," id. Sec. 24-146.1(c), and "establishing criteria for certifying individuals as eligible to receive an asbestos handling certificate and for certifying programs as approved safety and health programs," id. Sec. 24-146.1(d)(1).
 
 
 6
 In its statement of legislative findings and intent, the City Council stated that it found "that the predominant cause of asbestos becoming airborne is due to the performance of building renovation and demolition without adequate adherance [sic] to procedures for safeguarding workers and the general public, by persons who have not received adequate training in the handling of materials containing asbestos." Local Law 76, Sec. 1. The Council continued that the purpose of Local Law 76 was "to safeguard the public health by requiring that renovation or demolition projects which disturb asbestos be conducted in accordance with procedures established pursuant to the provisions of this local law and that workers who handle materials containing asbestos receive appropriate training." Id. (emphasis added).
 
 
 7
 On November 19, 1986 the DEP published its mandatory curriculum for the certification program. In December the City notified approximately 1200 contractors--including appellants--that employee certification would be required as of April 1, 1987. Mayor Koch thereupon signed Local Law 80, which required that asbestos workers hold the DEP training certificate as of April 1st. The City grants contractors a building or demolition permit only if they show that each employee working at an asbestos project holds such a certificate. Use of uncertified employees may result in fines or revocation of a previously issued building permit.
 
 
 8
 Under the DEP regulations an employee seeking an asbestos handling certificate must complete a four-day, DEP-approved training course and pass a two-hour written examination on subjects covered in the course. See Department of Environmental Protection, Rules and Regulations Governing Training of Asbestos Handlers, Asbestos Handler Supervisors, and Asbestos Investigators Secs. 8110-8111 (1986). Biennial review courses are required to renew the handler certificate. See id. Sec. 8123(b)(2). An approved DEP training course for asbestos handlers must cover specific topics--set out in full in the Appendix--and must encompass instruction on the physical characteristics of asbestos--one hour (id. Sec. 8111(a)(3)); the health hazards and effects of asbestos--two hours (id. Sec. 8111(a)(4)); requirements for medical surveillance procedures--one hour (id. Sec. 8111(a)(5)); respiratory protection--three and one-half hours (id. Sec. 8111(a)(6)); personal protective equipment--one-half hour (id. Sec. 8111(a)(7)); state-of-the-art work practices for asbestos abatement activities--two hours (id. Sec. 8111(a)(8)); case studies of problems arising in abatement activities--one hour (id. Sec. 8111(a)(9)); preparation of work area--three hours (id. Sec. 8111(a)(10)); federal, state, and local regulations--two hours (id. Sec. 8111(a)(11)); proper methods of collecting asbestos samples to minimize airborne fibers--one hour (id. Sec. 8111(a)(12)); remediation methods--two and one-half hours (id. Sec. 8111(a)(13)); decontamination systems--one and one-half hours (id. Sec. 8111(a)(14)); safety hazards--one hour (id. Sec. 8111(a)(15)); and personal hygiene--one hour (id. Sec. 8111(a)(16)). The cost of complying with the training and certification program is estimated at $600 per certified worker, which includes the cost of the training course and a $100 certification fee.
 
 B. Federal Regulations
 
 9
 Federal regulations also address problems of asbestos exposure, but emphasize protecting workers rather than safeguarding the public health. Specifically, OSHA's "Revised Construction Standard," promulgated in 1986, establishes updated asbestos exposure level standards and employee training requirements. See 29 C.F.R. Sec. 1926.58 (1987). Paragraph k of the Revised Construction Standard requires employers to communicate to their employees the dangers of asbestos by means of signs, labels, and employee information and training. Id. at Sec. 1926.58(k). An employer's training program must inform employees of the following subjects:
 
 
 10
 (A) Methods of recognizing asbestos ...;
 
 
 11
 (B) The health effects associated with asbestos ... exposure;
 
 
 12
 (C) The relationship between smoking and asbestos ... in producing lung cancer;
 
 
 13
 (D) The nature of operations that could result in exposure to asbestos, ... the importance of necessary protective controls to minimize exposure including, as applicable, engineering controls, work practices, respirators, housekeeping procedures, hygiene facilities, protective clothing, decontamination procedures, emergency procedures, and waste disposal procedures, and any necessary instruction in the use of these controls and procedures;
 
 
 14
 (E) The purpose, proper use, fitting instructions, and limitations of respirators as required by 29 C.F.R. 1910.134;
 
 
 15
 (F) The appropriate work practices for performing the asbestos ... job;
 
 
 16
 (G) Medical surveillance program requirements; and
 
 
 17
 (H) The content of [the Revised Construction] standard, including appendices.
 
 
 18
 Id. at Sec. 1026.58(k)(3). OSHA's Revised General Industry Standard contains comparable training provisions. See 29 C.F.R. Sec. 1910.1001(j)(5)(iii) (1987).
 
 
 19
 Although the Revised Construction Standard training program is mandatory, there is no requirement that asbestos handlers be tested or certified. After considering such a requirement, OSHA "determined that the training requirement in the final rule will provide construction employees with an understanding of the hazards of asbestos and the necessary protective measures to permit them to participate actively in their employer's training and hazard control programs." 51 Fed.Reg. 22,725 (1986). Employers may administer the training program themselves or may "rely on third-party training programs, such as EPA-sponsored courses on asbestos abatement." Id. In contrast, compliance with the City's DEP training course mandates that the employer utilize a DEP-approved, third-party program.
 
 PROCEEDINGS BELOW
 
 20
 On April 17, 1987 appellants brought the instant action in the United States District Court for the Southern District of New York (Walker, J.) seeking a declaratory judgment that the DEP program was invalid on the ground that the OSH Act and the Revised Construction Standard preempted the program or, alternatively, that the implementation of the program violated the due process clause of the Fourteenth Amendment. Appellants also moved for a preliminary injunction preventing enforcement of the DEP program. The district court entered a temporary restraining order preventing the City from enforcing the program against the appellants for 10 days, later extended until the date of that court's decision on appellants' motion for a preliminary injunction.
 
 
 21
 On July 31, 1987 Judge Walker denied appellants' motion for a preliminary injunction and granted the appellees' motion for summary judgment dismissing the complaint. Environmental Encapsulating Corp. v. City of New York, 666 F.Supp. 535 (S.D.N.Y.1987). The district court found that the OSH Act does not expressly preempt the DEP regulations because the DEP program "focuses on public health protection that is largely absent from the OSHA standard" and because "the thrust of the City's certification program goes well beyond that of the OSHA Revised Construction Standard." Id. at 541-42.
 
 
 22
 Judge Walker also rejected the argument that the OSHA regulatory scheme impliedly preempts the DEP program. He found that the DEP program has two purposes, first, to protect the public health and, second, to protect employee health and safety. Given these dual purposes, the court held that no implied preemption existed. Id. at 543. The district court declined to invalidate those portions of the DEP program which clearly related only to asbestos worker safety on the ground that "[t]o require that the City delete any mention of the potential hazard faced by individuals working with asbestos from the certification courses ... would render the courses at best incomplete, at worst seriously misleading." Id. at 545. Appellants' due process arguments were rejected as "border[ing] on the frivolous." Id. at 546. Environmental Encapsulating appeals only from the district court's preemption ruling.
 
 DISCUSSION
 
 23
 The issue on this appeal is whether the OSH Act and the OSHA Revised Construction Standard expressly or impliedly preempt the City of New York's DEP certification and training program. For the reasons set forth below, we affirm the judgment in part and reverse it in part.
 
 I Federal Preemption
 
 24
 Under the Supremacy Clause of the United States Constitution, federal law may preempt state law in several different ways. See generally Hillsborough County v. Automated Medical Laboratories, Inc., 471 U.S. 707, 712-13, 105 S.Ct. 2371, 2374-75, 85 L.Ed.2d 714 (1985); Pacific Gas & Elec. Co. v. State Energy Resources Conservation & Dev. Comm'n, 461 U.S. 190, 203-04, 103 S.Ct. 1713, 1721-22, 75 L.Ed.2d 752 (1983). Congress may preempt state law by so stating in explicit terms on the face of a statute. Jones v. Rath Packing Co., 430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604 (1977). Absent express preemptive language, preemption will be implied where federal legislation is so comprehensive in a given area as to leave no room for supplemental state legislation. International Paper Co. v. Ouellette, 479 S.Ct. 481, 491, 107 S.Ct. 805, 811, 93 L.Ed.2d 883 (1987); Hillsborough, 471 U.S. at 713, 105 S.Ct. at 2375; Pacific Gas & Electric, 461 U.S. at 203-04, 103 S.Ct. at 1721-22. Finally, even if Congress has not entirely displaced state action in the area, state law is preempted to the extent that it actually conflicts with federal law. Such conflict is found where "compliance with both federal and state regulations is a physical impossibility," Florida Lime & Avocado Growers, Inc. v. Paul, 373 U.S. 132, 142-43, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248 (1963), or where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," Hines v. Davidowitz, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941) (footnote omitted). Federal regulations as well as federal statutes can preempt state law. Hillsborough, 471 U.S. at 713, 105 S.Ct. at 2375.
 
 
 25
 In analyzing any claim of federal preemption, " 'the purpose of Congress is the ultimate touchstone.' " Fort Halifax Packing Co. v. Coyne, --- U.S. ----, 107 S.Ct. 2211, 2216, 96 L.Ed.2d 1 (1987) (quoting Metropolitan Life Ins. Co. v. Massachusetts, 471 U.S. 724, 747, 105 S.Ct. 2380, 2393, 85 L.Ed.2d 728 (1985)). There is a "presumption that state or local regulation of matters related to health and safety is not invalidated under the Supremacy Clause." Hillsborough, 471 U.S. at 715, 105 S.Ct. at 2376. The historic police powers of the states are not to be found preempted " 'unless that was the clear and manifest purpose of Congress.' " Id. (quoting Rath Packing, 430 U.S. at 525). The DEP program contested here unmistakably involves an exercise of a state's police powers. Cf. Huron Portland Cement Co. v. City of Detroit, 362 U.S. 440, 442, 80 S.Ct. 813, 815, 4 L.Ed.2d 852 (1960) ("Legislation designed to free from pollution the very air that people breathe clearly falls within the exercise of even the most traditional concept of what is compendiously known as the police power.").
 
 A. Express Preemption
 
 26
 Environmental Encapsulating contends that the DEP regulations are expressly preempted by the OSH Act. The extent of preemption is set forth in Sec. 18 of the Act.
 
 
 27
 (a) Assertion of State standards in absence of applicable Federal standards
 
 
 28
 Nothing in this chapter shall prevent any State agency or court from asserting jurisdiction under State law over any occupational safety or health issue with respect to which no standard is in effect under section 655 of this title.
 
 
 29
 (b) Submission of State plan for development and enforcement of State standards to preempt applicable Federal standards
 
 
 30
 Any State which, at any time, desires to assume responsibility for development and enforcement therein of occupational safety and health standards relating to any occupational safety or health issue with respect to which a Federal standard has been promulgated under section 655 of this title shall submit a State plan for the development of such standards and their enforcement.
 
 
 31
 29 U.S.C. Sec. 667 (1982); see generally Note, Getting Away with Murder: Federal OSHA Preemption of State Criminal Prosecutions for Industrial Accidents, 101 Harv.L.Rev. 535, 541-47 (1987) [hereinafter Note, Federal OSHA Preemption ] (discussing express preemptive effect of Sec. 18); Case Note, The Preemptive Effect of OSHA's Hazard Communication Standard Outside the Manufacturing Sector, 1985 B.Y.U.L.Rev. 815, 820-21 (Sec. 18 provides for express preemption).
 
 
 32
 In short, Sec. 18(b) provides that if a state wishes to develop and enforce an occupational safety and health standard that relates to an occupational safety or health issue covered by a federal standard, it must first submit the plan to OSHA. Conversely, when no federal standard covers such issues, under Sec. 18(a) a state is free to legislate in that area. See Note, Federal OSHA Preemption, supra, at 542. The inquiry regarding preemption under Sec. 18 focuses on federal regulations rather than the Act itself. In this regard it is significant that, unlike some other OSHA standards, the Revised Construction Standard contains no express assertion by OSHA of an intent to preempt state law. Cf. 29 C.F.R. Sec. 1910.1200(a)(2) (1987) (Hazard Communication Standard is "intended to address comprehensively the issue [of hazard communication] ... and to preempt any state law pertaining to this subject.").
 
 
 33
 1. Application of Sec. 18 to Local Legislation
 
 
 34
 The first issue to be addressed is whether Sec. 18 of the Act preempts local as well as state regulation. The text of the section refers solely to preemption of "state" standards and plans. The Sixth Circuit has held that this terminology excludes local legislation or regulation from the reach of Sec. 18. See Ohio Mfrs. Ass'n v. City of Akron, 801 F.2d 824, 831 (6th Cir.1986), cert. denied, --- U.S. ----, 108 S.Ct. 44, 98 L.Ed.2d 9 (1987). Disagreeing with this view, the district court concluded that political divisions of a state are subject to Sec. 18. 666 F.Supp. at 540. We agree with the district court for several reasons.
 
 
 35
 First, by definition the term "state" in the Act "includes a State of the United States, the District of Columbia, Puerto Rico, the Virgin Islands, American Samoa, Guam, and the Trust Territory of the Pacific Islands." 29 U.S.C. Sec. 652(7) (1982) (emphasis added). We are reluctant to read the term "includes" as meaning "is limited to." Moreover, it is well-settled that "a municipality is merely a political subdivision of the State from which its authority derives," United Bldg. & Constr. Trades Council v. Mayor of Camden, 465 U.S. 208, 215, 104 S.Ct. 1020, 1026, 79 L.Ed.2d 249 (1984), and that "for the purposes of the Supremacy Clause, the constitutionality of local ordinances is analyzed in the same way as that of statewide laws," Hillsborough, 471 U.S. at 713, 105 S.Ct. at 2375. Given this, it would be anomalous to construe Sec. 18 as granting a local government greater power than that possessed by its state government based simply on a mechanical application of the maxim expressio unius est exclusio alterius.
 
 
 36
 Finally--and perhaps most importantly--subsequent to the decision in Ohio Manufacturers Association OSHA itself asserted that the express preemption provisions of the Act "apply to all state or local laws which relate to an issue covered by a federal standard." 52 Fed.Reg. 31,860 (1987) (emphasis added); cf. Southeastern Community College v. Davis, 442 U.S. 397, 411, 99 S.Ct. 2361, 2369, 60 L.Ed.2d 980 (1979) (defer to agency's interpretation of statute under which it operates). Accordingly, we hold that the local legislation and regulations at issue here are within the scope of Sec. 18.
 
 2. Preemptive Effect of Sec. 18
 
 37
 We turn now to the question of whether the City's DEP program falls within the substantive scope of Sec. 18. Under Sec. 18(b), if a federal standard covers an occupational safety or health issue the states or their political subdivisions cannot promulgate an occupational safety or health standard relating to the issue, absent submission of the program to OSHA. 29 U.S.C. Sec. 667(b). Concededly, the DEP program was not submitted to OSHA for approval prior to its implementation.
 
 
 38
 The Revised Construction Standard clearly is a "Federal standard" within the meaning of Sec. 18. Moreover, since the OSH Act was enacted "to assure so far as possible every working man and woman in the Nation safe and healthful working conditions," 29 U.S.C. Sec. 651(b), the relevant occupational safety or health issue addressed by the Revised Construction Standard is that of protecting asbestos workers from the hazards resulting from exposure to asbestos fibers in the workplace. See New Jersey State Chamber of Commerce v. Hughey, 774 F.2d 587, 593 (3d Cir.1985) ("OSHA standards by definition govern occupational safety and health issues...."); see also Note, The Extent of OSHA Preemption of State Hazard Reporting Requirements, 88 Colum.L.Rev. 630, 640-41 (1988) (no congressional intent to preempt beyond field of employment). Hence, the scope of the Revised Construction Standard--and the concomitant scope of Sec. 18 preemption--is limited to protection of asbestos workers, and not the general public. Cf. 15 U.S.C. Sec. 2641(a)(4) (Supp. IV 1986) (noting lack of federal standards regulating public exposure to asbestos).
 
 
 39
 Section 18 and the Revised Construction Standard therefore preclude the City from promulgating an "occupational safety or health standard[ ]" that relates to the issue of abatement workers' exposure to asbestos. The Act defines "occupational safety and health standard" as "a standard which requires conditions, or the adoption or use of one or more practices, means, methods, operations, or processes, reasonably necessary or appropriate to provide safe or healthful employment and places of employment." 29 U.S.C. Sec. 652(8) (1982). Appellees argue that the City's program does not purport to regulate occupational health and safety and that the City's purpose is to safeguard public health and safety, that is, to protect workers in and occupants of buildings from the environmental threat of airborne asbestos fibers emanating from asbestos abatement projects in those buildings. Under appellees' view, protection of asbestos workers is only an incidental effect of the DEP program and the program therefore is not preempted by federal law because the DEP regulatory scheme is not a state or local "occupational safety or health standard" under Sec. 18(b).
 
 
 40
 We acknowledge that the asserted purpose of the DEP program is "to safeguard the public health." In contrast, the OSH Act only preempts regulation in the area of occupational health and safety. Local legislation enacted for the sole purpose of protecting the public health would not, on its face, be preempted by the Act. Cf. California Coastal Comm'n v. Granite Rock Co., 480 U.S. 572, 107 S.Ct. 1419, 1428-29, 94 L.Ed.2d 577 (1987) (upholding facial challenge to state environmental regulation when federal scheme only evinces intent to preempt state land use regulation); Pacific Gas & Electric, 461 U.S. at 213-16, 103 S.Ct. at 1726-28 (upholding state economic regulation where federal objective was to ensure safety). Yet, even a cursory examination of the individual provisions of the DEP regulations undercuts the City's characterization of the program as being solely motivated to protect the public health. We therefore adopt the district court's finding that the DEP program as enacted reveals dual purposes: first, to safeguard the public health and, second, to safeguard employee health and safety. See 666 F.Supp. at 543.
 
 
 41
 Given that there are dual purposes, appellants argue that it logically follows that the federal statute preempts the DEP program in its entirety. To support this proposition, they rely on interpretations of the express preemption clause in the Employee Retirement Income Security Act of 1974 (ERISA), which provides that ERISA provisions "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan...." 29 U.S.C. Sec. 1144(a) (1982) (emphasis added). Hence, they argue, ERISA's use of the term "relate to" is similar to Sec. 18(b)'s use of the term "relating to."
 
 
 42
 Congress planned for ERISA to have a broad preemptive effect, Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 98-100, 103 S.Ct. 2890, 2900-01, 77 L.Ed.2d 490 (1983), and regardless of the purposes of a state law, such law is preempted if it "relate[s] to"--construed expansively--an ERISA plan, see, e.g., Alessi v. Raybestos-Manhattan, Inc., 451 U.S. 504, 507, 101 S.Ct. 1895, 1898, 68 L.Ed.2d 402 (1981); Gilbert v. Burlington Indus., Inc., 765 F.2d 320, 326-27 (2d Cir.1985), aff'd mem., 477 U.S. 901, 106 S.Ct. 3267, 91 L.Ed.2d 558 (1986). But cf. Fort Halifax Packing Co., 107 S.Ct. at 2215-16 (although "relate to" should be construed expansively, state law must nevertheless relate to a "benefit plan"). In ERISA cases "[a] law 'relates to' an employee benefit plan, in the normal sense of the phrase, if it has a connection with or reference to such a plan." Shaw, 463 U.S. at 96-97, 103 S.Ct. at 2900. ERISA is not limited to preempting state laws "specifically designed to affect employee benefit plans." Id. at 98, 103 S.Ct. at 2900. Rather, in order to avoid preemption by ERISA, a state law must affect the plan "in too tenuous, remote, or peripheral a manner to warrant a finding that the law 'relates to' the [ERISA] plan." Id. at 100 n. 21, 103 S.Ct. at 2901 n. 21.
 
 
 43
 Appellants contend that the Court's interpretation of the term "relate to" in ERISA must also be applied to Sec. 18(b) of the OSH Act. Because the public, environmental hazards of asbestos emanate largely from on-going abatement projects, regulation designed to prevent public exposure inherently necessitates regulation of abatement workers. Any benefit to the public will inure to a greater degree to the abatement worker, who is in the closest proximity to the highest concentration of airborne asbestos fibers. Thus, in appellants' view the DEP program "has a connection with or reference to" occupational health and safety and we are obligated to find express preemption.
 
 
 44
 We are unpersuaded by this contention. The Supreme Court itself has labelled the ERISA preemption clause "virtually unique." Franchise Tax Bd. v. Construction Laborers Vacation Trust, 463 U.S. 1, 24 n. 26, 103 S.Ct. 2841, 2854 n. 26, 77 L.Ed.2d 420 (1983). The only textual affinity that Sec. 18 holds with ERISA's preemption provision is the use of the word "relate." Further, a close analysis of ERISA's legislative history buttressed the Court's expansive reading of the term "relate to." See Shaw 463 U.S. at 98-100, 103 S.Ct. at 2900-01. This history is absent in the context of the instant Act. Consequently, the ERISA cases upon which appellants rely must largely be confined to the ERISA regulatory scheme. See Hughey, 774 F.2d at 592-93 (rejecting application of ERISA cases in OSHA preemption case).
 
 
 45
 Hence, we consider what effect Sec. 18 of the Act--preempting state and local promulgation of occupational health and safety standards in areas covered by a federal standard--has on state or local regulations which have a legitimate purpose apart from one promoting occupational health and safety, but which also--even if incidentally--in fact promote occupational health and safety. Other courts have indicated that Sec. 18 preempts any state law which has as its "primary purpose" the promotion of occupational safety and health in an area covered by a federal standard. See Manufacturers Ass'n of Tri-County v. Knepper, 801 F.2d 130, 137 (3d Cir.1986) (OSHA's Hazard Communication Standard preempts state regulation which has primary purpose of promoting occupational safety and health), cert. denied, --- U.S. ----, 108 S.Ct. 66, 98 L.Ed.2d 30 (1987); Hughey, 774 F.2d at 593 (Hazard Communication Standard); New Jersey State Chamber of Commerce v. New Jersey, 653 F.Supp. 1453, 1465 (D.N.J.1987) (application of primary purpose test in Revised Construction Standard case). We do not disagree with this view. But "primary" is an ambiguous word, and to adopt its use leads down an unmarked avenue of inquiry into legislative motive, which is "often an unsatisfactory venture." Pacific Gas & Electric, 461 U.S. at 216, 103 S.Ct. at 1728. Thus, we hold that in order to avoid preemption the City must demonstrate only that for each of the DEP requirements there is a legitimate and substantial purpose apart from protecting asbestos workers. If this is demonstrated, the particular requirement is not a state "occupational safety and health standard" preempted by Sec. 18.
 
 3. Effect of Sec. 18 on the DEP Program
 
 46
 Applying this test to New York City's training and certification program, it can be seen that only two training requirements have as their sole purpose the promotion of occupational safety and health. Sections 8111(a)(5) (medical surveillance of asbestos abatement workers) and (6) (instruction on worker respiratory protection) are both designed to promote the health of the asbestos worker. Appellees themselves concede that these sections "deal specifically with worker safety." Accordingly, Secs. 8111(a)(5) and (6) are expressly preempted by the federal statute.
 
 
 47
 It is reasonably clear that all of the remaining sections of the program have a legitimate and substantial purpose to promote public safety and health. It has been officially documented "that family members of asbestos workers face a substantially increased risk of cancer and other asbestos-related diseases from exposure to asbestos carried home on work clothes." 51 Fed.Reg. 22,697 (1986). No doubt this risk applies--though less substantially--to all members of the public who come into contact with abatement workers. Education on the physical characteristics and aerodynamic qualities of asbestos (Sec. 8111(a)(3)), as well as education on the health hazards and effects of asbestos and routes of exposure (Sec. 8111(a)(4)), is crucial to understanding the threat that airborne asbestos imposes on the public and family members. Instruction on abatement worker's personal hygiene (Sec. 8111(a)(16)) is designed to contain asbestos to the abatement area and to prevent public contamination. Similarly, instruction on personal protective equipment (Sec. 8111(a)(7)) undoubtedly benefits the asbestos worker, but it also ensures that a worker through failure to wear proper clothing will not contaminate others by releasing asbestos fibers into the air. The DEP requirements for instruction in on-the-job work practices (Sec. 8111(a)(8)), case studies (Sec. 8111(a)(9)), preparation of the work area (Sec. 8111(a)(10)), regulatory requirements (Sec. 8111(a)(11)), air monitoring (Sec. 8111(a)(12)), remediation methods (Sec. 8111(a)(13)), and decontamination and airflow direction (Sec. 8111(a)(14)) guarantee that third parties are not exposed to asbestos either during the course of an abatement project or upon return to a project area after its completion. Finally, instruction in safety hazards (Sec. 8111(a)(15)) is necessary to protect against emergencies such as fire or explosion causing the spread of asbestos fibers into areas beyond that of the abatement project.
 
 
 48
 In sum, Sec. 18 of the Act expressly preempts only those portions of the DEP program which do not have a legitimate and substantial purpose apart from the promotion of occupational health and safety. Thus, we hold that Secs. 8111(a)(5) and (6) of the DEP program are expressly preempted by the OSH Act, but that the remaining program requirements, being directed at the protection of public health and safety, are not expressly preempted.
 
 B. Implied Preemption
 
 49
 Much of the district court's analysis rested on the theory of implied preemption. 666 F.Supp. at 542-46. As noted, preemption will be implied if Congress--or a federal agency--has evinced an intent to occupy a given field, leaving no room for supplementary state regulation. Hillsborough, 471 U.S. at 713, 105 S.Ct. at 2375; Pacific Gas & Electric, 461 U.S. at 203-04, 103 S.Ct. at 1721-22. Environmental Encapsulating contends that the Revised Construction Standard indicates OSHA's intent to occupy the field of education and training of asbestos workers as to asbestos health and safety hazards, whether those hazards be to the worker or to the public. An examination of the federal regulatory scheme reveals no such proprietary purpose.
 
 
 50
 It is important to keep in mind respect for the separate spheres of governmental authority present in our federalist system. For that reason, a state's police powers are not displaced by federal law unless there is compelling evidence that this was the manifest aim of Congress. See Hillsborough, 471 U.S. at 715-16, 105 S.Ct. at 2376; Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947). The burden of overcoming this presumption in favor of state law is heavy in those cases that rely on implied preemption, which rests in turn on inference. Inference and implication will only rarely lead to the conclusion that it was the "clear and manifest purpose," Rath Packing, 430 U.S. at 525, 97 S.Ct. at 1309, of the federal government to supersede the states' historic power to regulate health and safety.
 
 
 51
 Environmental Encapsulating first suggests that "[t]he Revised Construction Standard is so comprehensive as to convey OSHA's intent to occupy the field" of worker education in asbestos abatement regulation. Comprehensiveness alone is insufficient to justify preemption. See R.J. Reynolds Tobacco Co. v. Durham County, 479 U.S. 130, 149, 107 S.Ct. 499, 511-12, 93 L.Ed.2d 449 (1986); see also Hillsborough, 471 U.S. at 717, 105 S.Ct. at 2377 ("To infer pre-emption whenever an agency deals with a problem comprehensively is virtually tantamount to saying that whenever a federal agency decides to step into a field, its regulations will be exclusive."). Yet the only evidence--beyond a comprehensive regulatory scheme--that Environmental Encapsulating points to is a statement of OSHA which finds that the training requirements in the Revised Construction Standard will "provide construction employers with a consistent and comprehensive approach to alerting their employees to the hazards of asbestos exposure." 51 Fed.Reg. 22,724 (1986). Although this statement might provide support for implied preemption of training and education as to occupational health and safety, see id. at 22,72 5 (OSHA is concerned with "reduc[ing] the incidence of work-related diseases caused by exposure to hazardous workplace conditions"), it is insufficient to justify an inference that OSHA intended to occupy the entire field of worker training and education with regard to any safety aspects of asbestos.
 
 
 52
 In addition, the enactment of the Asbestos Hazard Emergency Response Act of 1986 (AHERA), Pub.L. No. 99-519, 100 Stat. 2970 (codified at 15 U.S.C. Secs. 2641-2654 (Supp. IV 1986)), is strong evidence that Congress itself does not view OSHA's regulatory scheme as a comprehensive attack on asbestos abatement hazards. AHERA requires training and accreditation--identical to that of the DEP program--of individuals working with asbestos in school buildings. 15 U.S.C. Sec. 2646(b)(1) (Supp. IV 1986). The impetus for enactment of AHERA arose out of Congress' concern for shoddy "rip-and-skip" abatement projects that endanger school children and school employees. See H.R.Rep. No. 763, 99th Cong., 2d Sess. 17, reprinted in 1986 U.S.Code Cong. & Admin.News 5004, 5007-08. In its findings, Congress stated that "[t]here is no uniform program for accrediting persons involved in asbestos identification and abatement," 15 U.S.C. Sec. 2641(a)(2) (Supp. IV 1986), and that "[b]ecause there are no Federal standards whatsoever regulating daily exposure to asbestos in other public and commercial buildings, persons in addition to those comprising the Nation's school population may be exposed daily to asbestos," id. Sec. 2641(a)(4). If Congress believed that OSHA had occupied the entire field of employee training, there would have been little reason to enact AHERA without at least acknowledging its view. Thus, we reject appellants' argument that OSHA intended to occupy the entire field of asbestos worker training.
 
 
 53
 Finally, appellants contend that even if OSHA has not occupied the field of worker training, the DEP program conflicts with federal law. No allegation is made that "compliance with both federal and state regulations is a physical impossibility." See Florida Lime, 373 U.S. at 142-43, 83 S.Ct. at 1217. Rather, appellants argue that the DEP program "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." See Hines, 312 U.S. at 67, 61 S.Ct. at 404 (footnote omitted). Such an obstacle, of course, justifies preemption regardless of the state's legitimate purpose. Pacific Gas & Electric, 461 U.S. at 216 n. 28, 103 S.Ct. at 1728 n. 28; Florida Lime, 373 U.S. at 142, 83 S.Ct. at 1217.
 
 
 54
 Appellants develop this contention by claiming that in promulgating the Revised Construction Standard, OSHA intended employers be the exclusive educators of their employees, and that the City training and certification program conflicts with this intent both by requiring training by an outside source and by requiring certification. This argument is flawed in three respects. First, OSHA has expressly stated that employers can rely on third-party training to satisfy the Revised Construction Standard's requirements, see 51 Fed.Reg. 22,725 (1986), thus pulling the rug from under appellants' exclusivity argument. Second, appellants place great emphasis on the fact that OSHA rejected a formal training and certification requirement in promulgating the Revised Construction Standard. See id. Yet, mere rejection by OSHA of such a program does not by implication constitute official disapproval of the program, as the district court correctly observed. See 666 F.Supp. at 542. Finally, turning to the City's certification requirement, it is true that the City cannot interfere with the methods chosen by the federal government to achieve a particular goal. At the same time, appellants fail to show that the City's choice of a certification program as a method for implementing its training requirement conflicts or interferes in fact with the federal scheme. Compare California Coastal, 107 S.Ct. at 1429 ("[U]se of a permit requirement to impose the state regulation does not create a conflict with federal law where none previously existed.") with Ouellette, 107 S.Ct. at 813 (state common law actions interfere with federal permit system).
 
 
 55
 The argument that the Act requires uniformity that the DEP program might disrupt is equally meritless. The statute's purpose was to assure minimum--but not necessarily uniform--occupational health and safety standards. See Ohio Manufacturers Association, 801 F.2d at 831; S.Rep. No. 1282, 91st Cong., 2d Sess., reprinted in 1970 U.S. Code Cong. & Admin.News 5177, 5182; see also Hillsborough, 471 U.S. at 722 n. 5, 105 S.Ct. at 2379 n. 5 (no interference where federal interest is to ensure minimum standards). Environmental Encapsulating illogically asserts that OSHA's rejection of required third-party training suggests a demand for uniformity in this area. To the contrary, allowing each employer to conduct its own program hinders rather than facilitates uniformity. In short, we hold that the DEP program does not conflict with the purposes of the Act or with the Revised Construction Standard.
 
 II Severability
 
 56
 We earlier held that two provisions of the DEP program--Secs. 8111(a)(5) and (6)--are expressly preempted by the OSH Act and are therefore invalid. The question remains whether these provisions are severable from the remaining parts of the DEP program. Severability is a question of state law. See Watson v. Buck, 313 U.S. 387, 395-96, 61 S.Ct. 962, 964, 85 L.Ed. 1416 (1941). New York law provides that invalid portions of a statute may be severed if "the remaining portions are sufficient to effect the legislative purpose deducible from the entire act" unless "the valid and invalid portions are so interwoven that neither can stand alone." N.Y. Statutes Sec. 150(d) (McKinney 1971) (footnote omitted).
 
 
 57
 Quite plainly the invalid sections of the City's program are severable from the remainder of the program. The absence of the medical surveillance and respiratory protection requirements will neither render the City's program incapable of advancing the purpose of protecting public safety nor cause the regulatory scheme to founder. The preempted requirements need only be excised from the course curriculum, leaving the remainder of the program viable and intact. Thus, we sever Secs. 8111(a)(5) and (6) from the DEP regulations.
 
 CONCLUSION
 
 58
 To summarize, the OSH Act deprives states and their political subdivisions only of their jurisdiction over those occupational safety and health issues covered by a federal standard. The Act and OSHA's Revised Construction Standard leave states free to regulate when their purpose is to safeguard public--as opposed to occupational--health and safety. We hold preempted those two sections of the DEP program not having such a purpose. With this exception, the judgment of the district court is affirmed.
 
 
 59
 Judgment affirmed in part and reversed in part.
 
 APPENDIX
 
 60
 DEP Rules and Regulations Governing Training of Asbestos Handlers, Asbestos Handler Supervisors and Asbestos Investigators, Sec. 8111
 
 Asbestos Handlers--Initial Training Course
 
 61
 (a) The initial training course for asbestos handlers shall, at a minimum, provide the following instruction and cover the following topics:
 
 
 62
 1. A total course time of at least 26 hours (four days).
 
 
 63
 2. A two hour, 50 question written examination on the final course day.
 
 
 64
 3. The physical characteristics of asbestos including fiber size, aerodynamic properties and the recognition of types of asbestos and asbestos products. MRT [minimum required time] 1 hr.
 
 
 65
 4. The health hazards and effects of asbestos including asbestos related diseases, routes of exposure, dose response relationships, clinical signs of asbestos exposure, synergistic relationship between asbestos exposure and cigarette smoking and the health risk to family members. MRT 2 hr.
 
 
 66
 5. Requirement for medical surveillance procedures; explanation of the purpose and limitations of medical examinations, to include a description of: posterior/anterior chest x-rays (14" x 17"), pulmonary function tests and a medical and work history; explanation of the medical record-keeping requirements of OSHA 29 CFR 1926.58 and the right of employee access to records. MRT 1 hr.
 
 
 67
 6. Respiratory Protection (hands-on practice required) including the types, characteristics and limitations of respiratory classes; explanation of NIOSH approval (tested and certified); proper selection, inspection, donning, use, maintenance and storage procedures; methods of field testing of the facepiece-to-face seal (positive and negative pressure tests); variability between laboratory and field fit factors; factors that alter respirator fit (e.g., facial hair). MRT 3 1/2 hrs.
 
 
 68
 Demonstration exercises of the respirators listed below shall include qualitative or quantitative face fit testing for all negative pressure respirators. Qualitative fit testing may be used only for testing half mask negative pressure respirators. The exercises shall also include the wearing, adjusting filter replacing and cleaning procedures for each type of respirator. Each student shall have individually supervised practice using the three types of respirators listed below:
 
 
 69
 a) Type C Supplied Air Respirators, Continuous Flow or Pressure Demand Class (SAR):
 
 
 70
 Description of physical characteristics; purpose; limitations; components of the respirator, including: the compressed air cylinders, compressors and compressor systems, and quality specifications for compressed air, low air alarm, pressure regulator, breathing hose, facepiece, and HEPA filter disconnect.
 
 
 71
 b)Powered Air-Purifying Respirators (PAPR):
 
 
 72
 Description of physical characteristics; purpose; limitations; components of the respirator, including: HEPA filters, battery, breathing hose and facepiece.
 
 
 73
 c) Air-Purifying Respirator (APR):
 
 
 74
 Description of physical characteristics; purpose; limitations; components of the respirator, including: full/half facepiece, HEPA filters and cartridges.
 
 
 75
 7. Personal Protective Equipment (PPE) including the types of disposable/non-disposable clothing (suits, booties, hood-covering, gloves); the requirements, purpose, selection, donning, removal, storage, handling and disposal; eye protection; hard hats and footwear. MRT 1/2 hr.
 
 
 76
 8. State-of-the-art Work Practices for asbestos abatement activities including: purpose, proper construction and maintenance of barriers and decontamination enclosure systems, electrical and ventilation lock-out systems, proper working techniques for minimizing fiber release; use of wet methods and surfactants; use of negative pressure ventilation equipment; use of HEPA vacuums and proper clean up and disposal procedures; work practice requirements as they apply to the removal encapsulation, enclosure and repair of asbestos shall be discussed at length. MRT 2 hrs.
 
 
 77
 9. Case studies including a presentation by the course instructor of typical problems which have occurred during asbestos abatement activities and how these problems have been resolved; discussion of student's previous experience. MRT 1 hr.
 
 
 78
 10. Preparation of Work Area (hands-on practice required) including workshops affording abatement workers the opportunity to experience the construction of containment barriers and the decontamination enclosure systems; the cleaning and removal of furniture and the sealing of unremovable furniture and equipment such as duct work; the posting of warning signs. Students shall be appropriately suited in PPE for these procedures. MRT 3 hrs.
 
 
 79
 11. Scope of all current and proposed OSHA, EPA, New York State and New York City Regulations including air monitoring, medical monitoring, written respiratory protection programs, record keeping and employee notification of exposures and the requirements, procedures and standards. MRT 2 hrs.
 
 
 80
 12. Proper methods of collecting bulk samples to minimize generation of airborne fibers. The explanation of air monitoring including the purpose and method of collecting and analyzing area and personal samples and current N.Y.C. standards. MRT 1 hr.
 
 
 81
 13. Remediation Methods (hands-on practice required) including workshops on actual methods of removal, encapsulating, enclosure, and repair (including glove bag demonstration); the disposal process including bagging, labeling, drum storage and transport; the cleanup techniques and sequence of activities. Students shall be appropriately suited in PPE for these procedures. All materials used for hands-on demonstrations shall be non-asbestos materials. MRT 2 1/2 hrs.
 
 
 82
 14. Decontamination System (hands-on practice required) including the sequential steps of workers in the cleanroom, shower room and equipment room; direction of air flow through the rooms; the security of the work area and the purpose of the exit and entry log. Students shall be appropriately suited in PPE for these procedures. MRT 1 1/2 hr.
 
 
 83
 15. Special Safety Hazards including electrical, fire, and explosion hazards; scaffold and ladder hazards; confined spaces; walking and working surfaces; heat stress, noise and air contaminants other than asbestos (e.g. CO, surfactants, encapsulants). MRT 1 hr.
 
 
 84
 16. Personal Hygiene including entry and exit procedures, use of showers, storage of street clothes and the prohibition of eating, drinking, smoking and chewing of gum or tobacco and the application of cosmetics in the work area. MRT 1 hr.
 
 
 85
 17. Review of course material to provide participants with clarification of certain areas in question. The course evaluation shall also be conducted at this time. MRT 1 hr.
 
 
 86
 18. Examination: The examination shall consist of a minimum of 50 questions on the topics required in this article and be of such nature as the Department shall consider appropriate. A score of 70% or higher shall be recognized as a passing grade. MRT 2 hrs.
 
 
 
 *
 Honorable Louis L. Stanton, United States District Judge for the Southern District of New York, sitting by designation